PERKINS COIE LLP
30 Rockefeller Plaza, 25th Floor
New York, New York 10112-0015
(212) 262-6900
Attorneys for SPF 2011 Owner LLC

TEICH GROH
691 State Highway 33
Trenton, NJ 08619
(609) 890-1500
Attorneys for Fishbein Family, LLC

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FISHBEIN FAMILY, LLC, | Case No. 11-34514 (NLW) |
| Debtor. | Hearing Date: _____, 2013 |

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF**
**THE BANKRUPTCY CODE DESCRIBING JOINT LIQUIDATING**
**PLAN OF REORGANIZATION PROPOSED BY FISHBEIN FAMILY, LLC AND**
**SPF 2011 OWNER, LLC**

PLEASE READ THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS PLAN OF LIQUIDATION (THE "PLAN"). THE PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE PROPONENTS URGE THAT THE VOTER ACCEPT THE PLAN.

Dated:  November 27, 2013      Proponents   FISHBEIN FAMILY, LLC
                                        By:   /s/ Iris E. Buchman
                                     Title:   Managing Member


                                              SPF 2011 OWNER LLC
                                        By:   /s/ Dennis Davis
                                     Title:   Authorized Signatory

      THIS    DISCLOSURE    STATEMENT    AND    ITS    RELATED
DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO
BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT
OR REJECT THE PLAN.

      THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY
OF THE PLAN AND IS **NOT** INTENDED TO REPLACE A CAREFUL AND
DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT RATHER TO AID
AND SUPPLEMENT SUCH REVIEW.   THIS DISCLOSURE STATEMENT IS
QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED
PROVISIONS SET FORTH IN THE PLAN (WHICH IS INCLUDED AS <u>EXHIBIT A</u>
TO THIS DISCLOSURE STATEMENT).   IN THE EVENT OF A CONFLICT
BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS
OF THE PLAN WILL GOVERN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED
TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS
ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO,
BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN.

      THE    STATEMENTS    CONTAINED    IN    THIS    DISCLOSURE
STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF
THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION

CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

    A.    Purpose of This Document......................................................... 1

              (1)    WHO CAN VOTE OR OBJECT,........................ 2

              (2)    THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION, ...................................... 2

              (3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY, ...................................... 2

              (4)    WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN, ................................. 2

              (5)    THE EFFECT OF CONFIRMATION, AND........ 2

              (6)    THE FEASIBILITY OF THE PLAN. ................... 2

    B.    Confirmation Procedures ........................................................... 3

        1.    Time and Place of the Confirmation Hearing ............................... 5

        2.    Deadline For Voting For or Against the Plan ............................... 5

        3.    Deadline For Objecting to the Confirmation of the Plan.............. 5

        4.    Identity of Person to Contact for More Information Regarding the Plan........................................................................ 6

    C.    Disclaimer ................................................................................. 6

II.    BACKGROUND .................................................................................. 6

    A.    Description and History of the Debtor's Business...................... 6

    B.    Principals/Affiliates of Debtor's Business ............................... 13

    C.    Management of the Debtor Before and During the Bankruptcy.............. 13

    D.    Events Leading to Chapter 11 Filing ....................................... 14

i

# TABLE OF CONTENTS
(continued)

**Page**

E.    Significant Events During the Bankruptcy ................................ 17

    1.    Other Legal Proceedings.................................................. 17

    2.    New Property Management .............................................. 17

    3.    Recovery of Preferential or Fraudulent Transfers ....................... 18

    4.    Current and Historical Financial Conditions ............................. 18

    5.    Sale of 50 Industrial ....................................................... 19

    6.    Sale of 816 Garfield Avenue........................................... 19

    7.    575 Property .................................................................. 19

III.    SUMMARY OF THE PLAN OF REORGANIZATION................................... 19

    A.    General.............................................................................. 19

    B.    Plan Overview..................................................................... 20

    C.    What Creditors and Interest Holders Will Receive Under the
    Proposed Plan.................................................................... 21

    D.    Unclassified Claims ............................................................ 21

    1.    Administrative Expenses and Fees ............................. 21

    2.    Priority Tax Claims.................................................... 23

    3.    Assumed Executory Contracts and Unexpired Leases ................ 24

    E.    Classified Claims and Interests................................................. 24

    1.    Classification of Claims and Interests.......................... 24

    a.    Class Categories ............................................... 24

    F.    Means of Effectuating the Plan................................................. 26

    1.    Funding for the Plan.................................................. 26

    2.    Disbursing Agent ..................................................... 26

    a.    Powers of the Disbursing Agent ...................... 27

    b.    Duties of the Disbursing Agent........................ 27

    3.    Conduct of the Marketing Plan and the Sale ............................... 27

ii

## TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| | 4. | Income Tax Consequences of the Sale | 31 |
| G. | | Other Provisions of the Plan | 31 |
| | 1. | Executory Contracts and Unexpired Leases | 31 |
| | | a. Rejected if not assumed | 31 |
| | | b. Objection to Assumption | 32 |
| | 2. | Changes in Rates Subject to Regulatory Commission Approval | 32 |
| | 3. | Retention of Jurisdiction | 32 |
| | 4. | Procedures for Resolving Contested Claims | 32 |
| | 5. | Claims To Which Proponents Intend to Object | 33 |
| | 6. | Release of Debtor Claims against Lender and Lender Against Iris Buchman | 33 |
| H. | | Conditions Precedent to Effective Date | 34 |
| | | a. The Confirmation Order shall have become a Final Order; | 34 |
| | | b. Any and all other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of this Plan shall have been executed, and approved by the Court, if necessary, prior to the Effective Date; | 34 |
| | | c. The Administrative Claims do not exceed $200,000.00; and | 34 |
| | | d. The income tax consequences of the Plan to the Estate are as set forth in section III.F.4 above. | 34 |
| | 2. | Modification | 35 |
| IV. | | CONFIRMATION REQUIREMENTS AND PROCEDURES | 35 |
| A. | | Who May Vote or Object | 35 |
| | 1. | Who May Object to Confirmation of the Plan | 35 |

iii

# TABLE OF CONTENTS
(continued)

**Page**

2.    Who May Vote to Accept/Reject the Plan ................................... 35

        a.      What Is an Allowed Claim/Interest ................................ 35

        b.      What Is an Impaired Claim/Interest ............................... 36

3.    Who Is Not Entitled to Vote ....................................................... 36

4.    Who Can Vote in More Than One Class ..................................... 37

5.    Votes Necessary to Confirm the Plan .......................................... 37

6.    Votes Necessary for a Class to Accept the Plan .......................... 37

7.    Treatment of Non-accepting Classes ........................................... 38

8.    Request for Confirmation Despite Non-acceptance by Impaired Classes ........................................................................ 38

B.    Best Interests of Holders of Claims and Interests/Liquidation Analysis ........................................................................................ 38

C.    Financial Feasibility ............................................................................ 40

V.    CERTAIN RISK FACTORS TO BE CONSIDERED ........................................ 41

A.    Certain Bankruptcy Law Considerations ................................................ 42

1.    Risk of Non-Confirmation of the Plan ........................................ 42

2.    Risk of Non-Occurrence of the Effective Date ........................... 42

B.    Additional Factors to be Considered ....................................................... 42

1.    The Proponents Have No Duty to Update ................................... 42

2.    No Representations Outside This Disclosure Settlement Are Authorized ........................................................................... 42

3.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary ................................ 43

4.    No Legal or Tax Advice is Provided to You By This Disclosure Statement ................................................................. 43

5.    No Admission Made .................................................................... 43

6.    Objection to Classifications ........................................................ 44

iv

# TABLE OF CONTENTS

(continued)

**Page**

VI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................... 44

    A.  Taxes ............................................................................................ 44

        1.  Allocation of Consideration to Interest ........................................ 46

    B.  New Common Stock ...................................................................... 47

VII.  EFFECT OF CONFIRMATION OF PLAN ......................................................... 47

    A.  Effect of Confirmation or non-Confirmation on Plan ............................. 47

    B.  Exculpation ............................................................................... 48

    C.  Non-Vesting of Property in the Debtor .................................................. 48

    D.  Modification of Plan .................................................................... 48

    E.  Post-Confirmation Conversion/Dismissal ................................................ 49

    F.  Post Confirmation Fees ................................................................ 49

VIII.  ALTERNATIVES TO REORGANIZATION PLAN ......................................... 49

IX.  CONCLUSION ................................................................................... 50

v

# I.

# INTRODUCTION

Fishbein Family, LLC ("Fishbein" or the "Debtor") is the debtor in this Chapter 11 bankruptcy case (the "Chapter 11 Case").  On August 17, 2011 (the "Petition Date"), Fishbein commenced a bankruptcy case (the "Bankruptcy Case") by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. §101, et seq.  The Bankruptcy Case is currently pending in the U.S. Bankruptcy Court for the District of New Jersey (the "Court").  Chapter 11 of the Code allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization or liquidation.  SPF 2011 Owner LLC ("Lender") is a secured creditor of Fishbein.  Debtor and Lender (collectively, the "Proponents") are jointly proposing the Plan that is described herein.  The Plan provides for the sale of substantially all of Debtor's assets, with proceeds distributed to creditors as directed by the Plan.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN WHICH IS ANNEXED HERETO AS EXHIBIT "A".

This is a liquidating plan. In other words, the Proponents seek to liquidate the Debtor's assets, distribute the proceeds and restructure certain liens, covenants and agreements relating to the Debtor's property.

## A.     Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and provides you with certain information relating to the Plan and the process that the Court follows in determining whether or not to confirm the Plan.

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code to all the known creditors of the Debtor.  The purposes of this Disclosure Statement

1

is to provide sufficient information to enable creditors who are entitled to vote to make an informed decision on whether to accept or reject the Plan.  This Disclosure Statement describes, among other things:

(1)   **WHO CAN VOTE OR OBJECT,**

(2)   **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

(3)   **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

(4)   **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

(5)   **THE EFFECT OF CONFIRMATION, AND**

(6)   **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Bankruptcy Code section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information"  is defined in Bankruptcy Code section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.  The Court has determined that the information

contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Bankruptcy Code section 1124.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor and to each interest holder of record as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.    Confirmation Procedures**

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. All holders of equity interests in the Debtor of record as of the date of approval of this Disclosure Statement may vote on the Plan. The ballot form that you received does not constitute a proof of claim, and receipt of a ballot from you is not a waiver of any objection that the Lender may have to your ballot. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's petition schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, District of New Jersey, U.S. Court House, King Federal Building, 50 Walnut Street, Newark, NJ 07102. The Clerk of the Bankruptcy Court will not provide this information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT

LEGAL28595654.3

LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND EQUITY INTEREST HOLDERS IN THIS CHAPTER 11 CASE.

The date of entry of an order approving this Disclosure Statement is fixed as the "Voting Record Date."  Only Persons who hold Claims, other than any other parties specified by the Court, are entitled to receive a copy of this Disclosure Statement and all of the related materials.

In order to conserve cost and expenses, the Debtor's bankruptcy counsel has agreed to serve as the balloting agent (the "Balloting Agent") for the purpose of receiving ballots to accept or reject the Plan and to calculate and report on voting results. Please complete and sign your ballot and return it in the enclosed pre-addressed envelope to the Balloting Agent at:

> TEICH GROH
> Attn:  Brian W. Hofmeister, Esq.
> 691 State Highway 33
> Trenton, NJ 08619
> Telephone:  (609) 890-1500

ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR **TO _____, 2014 AT 5:00 p.m.  (EDT)** (THE "VOTING DEADLINE" OR "BALLOTING DEADLINE") WILL BE COUNTED FOR THE PURPOSE OF DETERMINING WHETHER THE VOTING CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN HAS ACCEPTED THE PLAN. <u>ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE COURT. SEE ARTICLE IV OF THIS DISCLOSURE STATEMENT FOR FURTHER INFORMATION REGARDING CONFIRMATION AND VOTING ISSUES</u>.

LEGAL28595654.3

**Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are employed.**

### 1.    Time and Place of the Confirmation Hearing

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, 2014, at ____.m., United States Bankruptcy Court, District of New Jersey, Clarkson S. Fisher Federal Building, 402 East State Street, Trenton, NJ 08608.

### 2.    Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Perkins Coie LLP, 30 Rockefeller Plaza, 25th Floor, New York, New York 10112, Attn:  Gary F. Eisenberg, Esq.

Your ballot must be received by _____, 2014, at 5:00 p.m. or it will not be counted.

### 3.    Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon (1) Perkins Coie LLP, counsel for the Proponent, 30 Rockefeller Plaza, 25th Floor, New York, New York 10112, (Attn: Gary F. Eisenberg, Esq.), (2) Teich Groh, counsel for the Debtor, 691 State Highway 33, Trenton, NJ 08619 (Attn: Brian W. Hofmeister, Esq.), and (3) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, New Jersey 07102.  All such objections must be filed and served no later than _____, 2014.

LEGAL28595654.3

4.      **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan may contact counsel for the Debtor, Brian W. Hofmeister, Esq., Teich Groh, 691 State Highway 33, Trenton, NJ 08619, telephone:  (609) 890-1500, email:  bhofmeister@teichgroh.com, or counsel for the Lender, Gary F. Eisenberg, Esq., Perkins Coie LLP, 30 Rockefeller Plaza, 22nd Floor, New York, New York 10112, telephone:   (212) 262-6900, email: geisenberg@perkinscoie.com.

**C.      Disclaimer**

The financial data relied upon in formulating the Plan is based on financial information that Debtor has filed with the Court.  The Proponents do not warrant the accuracy of Debtor's financial information.

PLEASE  NOTE  THAT  THE  APPROVAL  OF  THIS  DISCLOSURE STATEMENT  BY  THE  BANKRUPTCY  COURT  DOES  NOT  CONSTITUTE  A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.

## II.

## BACKGROUND

**A.      Description and History of the Debtor's Business**

The Debtor is organized as a New Jersey limited liability company.  The Debtor's only business activity is the holding and management of certain real property owned by the Debtor.  According to Debtor's bankruptcy schedules, the Debtor owns the following parcels of real property, all located in New Jersey:

| #  | Address | Description |
|----|---------|-------------|
| 1  | 685 Liberty Ave., Union | Block 3702, Lot 1 |
| 2  | 575 Rt. 28, Raritan | Block 26, Lot 11.02 |
| 3  | 626 N. Thompson St., Raritan | Block 26, Lot 11.01 |

6

| 4 | 50 Industrial Rd., Berkeley Heights[1] | Block 1301, Lot 14.01 |
| 5 | 40 Industrial Rd., Berkeley Heights | Block 1301, Lot 15 |
| 6 | 816 Garfield Ave., Jersey City [2] | Block 2006.A, Lot 3 |
| 7 | Delancy St., South Plainfield | Block 255, Lot 14 |
| 8 | Liberty Ave. Parking Lot, Union | Block 3701, Lot 2.01 |

Other than depository accounts, utility deposits, and a small amount of personal property, the real property listed above is the Debtor's only asset.

The first five properties (the "Collateral Properties") are subject to a lien in the principal amount of over $13.8 million plus interest, costs, expenses, and legal fees, as of August 23, 2012. Debtor holds the last three properties (the "Non-Collateral Properties"; together with the Collateral Properties, the "Properties") free and clear of liens and security interests.

The Collateral Properties are all industrial properties rented as office, manufacturing, commercial, and warehouse space. The Non-Collateral Properties consist of two parking lots and one undeveloped parcel of real estate. The Lender has, through its representatives and its servicer, conducted a review of the current conditions of the Collateral Properties, the findings of which are discussed in detail below.

1.      685 Liberty Avenue

There is a "class C" office and warehouse building on the property which is currently dirty and in poor condition. The building is a total of 63,368 square feet, 59,868 of which is rentable space.

---

[1] This property was sold by order (the "Sale Order") of the Bankruptcy Court issued March 26, 2012 [docket no. 88].

[2] This property was authorized to be sold by order (the "816 Garfield Sale Order") of the Bankruptcy Court issued September 24, 2013 [docket no. 174].

7

The property is currently 94% occupied by a mix of tenants paying rents ranging from $6.08 to 22.51 per square foot.  Rents vary largely due to the type of space (i.e., warehouse vs. office) that the tenant occupies.  The largest tenant occupies 18,153 square feet of office space and 13,000 feet of warehouse space.  Approximately 18% of the building (10,600 square feet) is occupied by a tenant whose lease expired on February 28, 2011.  This tenant is currently delinquent on its rent obligations.  The 3,500 square feet of vacant space is some of the most desirable space in the building, and is currently occupied by the Debtor.  Many of the building's recent tenants have been on month-to-month leases and have not maintained the premises.  The tenant which occupies the largest portion of the building (approximately 30% of the total space) is creditworthy and may be interested in expanding its space.

The Lender believes the approximate value of this property to be not more than $3,800,000.00.  The Lender further believes that if the building were repaired and upgraded, it could be leased to better tenants for higher rent than is currently received by the Debtor.

The property is in need of approximately $100,000 of repairs, including parking lot resealing, various interior repairs, landscaping upgrades, and roof repairs.  Lender believes this property is free of serious environmental contamination.

**2.     575 Route 28**

This property contains a "class C" office building with 35,859 square feet of rentable space.  The Lender believes to the building to be worth not more than $3,000,000.00 million.  The current tax assessed value is $6.7 million, which the Lender

LEGAL28595654.3

believes is too high; thus, there may be potential for tax savings through the valuation appeal process.

The building is currently dirty and in poor condition.  Necessary repairs include concrete work, new exterior doors, replacement of the entryway awning, extensive cleaning, HVAC repairs, and landscaping.  The Lender previously had estimated that the needed repairs would cost at least $150,000.  During the summer of 2013, the HVAC system's need for repairs became dire and not capable of further delay.  Agent procured outside vendors to replace the 20-ton make-up air unit (the "MAU"), repair the water cooling tower, service and clean the heat pumps and install a water treatment system. The work was in progress in October 2013.  Lender funded these repairs.

The building is currently 63% occupied.  The largest tenant occupies 7,500 square feet under a lease that expires in 2015.  Thirteen percent of the building is occupied by month-to-month tenants.  The property has potential to increase in value, as it is in a desirable location, adjacent to a country club; however, the Lender has been of the view that creditworthy tenants will not rent space in the building until extensive repair work has been completed.  It is not clear if the repairs described above will suffice.

There are potential environmental problems with this parcel.  The property previously housed underground storage tanks ("USTs") that were removed prior to the Debtor's acquisition of the land.  The immediately prior owner, Henderson Corporation, is an architectural and engineering firm.

According to information obtained through Lender's review, the USTs were located apart and below grade from the main office building, underneath (or adjacent to) a storage shed.  Although the USTs stored petroleum, test wells that have recently been

placed on the property have shown contamination by various cleaning solvents.  The
contamination levels shown by the test wells initially appeared to be above acceptable
levels set by the New Jersey Department of Environmental Protection ("DEP").  This
prompted various environmental analyses by the prior owner.  Its consultant, PT
Consultants Inc. ("PTC"), issued a Remedial Action Outcome letter, dated September 24,
2013, by which PTC, as the Licensed Site Remediation Professional ("LSRP") under the
DEP's Site Remediation Program, certified to the DEP that the cleanup at the site was
completed in accordance with DEP regulations.  PTC, as the LSRP, exercised oversight
over the remediation at the 575 Route 28 property, effectively stepping in for DEP as the
remediation regulator.  The RAO brings the remediation to a close and, by operation of
law, the issuance of a RAO carries with it a covenant not to sue.

> **3.    626 North Thompson Street**

This property is located behind the 575 Route 28 property and houses a 16,955
square-foot "class C" office building.  Although the tax assessed value is $1.7 million,
the Lender believes that the current fair market value is not more than $765,000.00.
There are two tenants in the property who together occupy 38% of the total space.

This property is in the worst condition of all the Collateral Properties.  The
building is in poor shape with multiple roof leaks and interior damage from water
penetration.  The parking area is in poor condition.  There is also a possibility that the
environmental testing at the adjacent 575 Route 28 property could reveal contamination
of this parcel as well.

> **4.    50 Industrial Road**

10

This property includes a 51,752 square-foot warehouse building that is currently vacant. The building is in average to poor condition and needs repairs to the roof and exterior fenestration, as well as resealing of the parking area.

On February 28, 2012, the Debtor filed a motion to sell this property free and clear of liens, pursuant to section 363 of the Bankruptcy Code. The Lender filed a limited objection to the this on March 9, 2012, generally supporting the sale of the 50 Industrial Road property but raising specific limited objections to the Debtor's proposed form of order. The Bankruptcy Court granted the motion on March 26, 2012, by entering the Sale Order. The sale approved under the Sale Order closed on or about June 18, 2012, generating net proceeds of $2,703,256.61 (the "Existing Sale Proceeds"). The Existing Sale Proceeds are being held pursuant to the Sale Order by Debtor's special counsel Price, Neese, Shulman & D'Arminio, with liens that previously attached to that property attaching to the Sale Proceeds to the same extent and priority.

Under this Plan, the proceeds of the sale of 50 Industrial Road will be used to first pay administrative claims, described in more detail in Section III.D of this Disclosure Statement. Any remaining proceeds will be paid to the Lender on account of its secured claim.

### 5.      40 Industrial Road

This property houses a 43,634 square-foot warehouse building that is currently rented by a publishing company. The current tenant pays $4.75 per square foot (triple net) under a lease that runs through June 2014. The Lender believes that the property is in need of various repairs, costing approximately $25,000 and estimates the property to

11

be worth not more than $2,300,000.00. The property is in the same desirable neighborhood as the 50 Industrial Road property, discussed above.

Examination and communication from Debtor's counsel show that there is a large berm of dirt on this property which had previously been created by Hoagland Corporation, a neighboring property owner. The dirt is contaminated, thus the berm must be removed and vapor testing must be conducted before the property can be sold. The Proponents believe that other parties, possibly including Hoagland, have established a fund for the removal of the berm. The Lender is currently seeking additional information about this funding source. Recent test wells have also revealed contaminated water on the property.

The Lender has been informed that previous efforts by adjoining landowners to remedy the environmental contamination have been intentionally thwarted by Debtor. If the contamination can be mitigated, the Lender believes this property has strong potential to attract interested buyers.

### 6.    The Non-Collateral Properties

In addition to the above Properties, all of which are encumbered by the Lender's mortgages, the Debtor owns three Properties that are not encumbered by the Lender's mortgages (the "Non-Collateral Properties"). These are:

(i)    816 Garfield Avenue, Jersey City, New Jersey - This Property is a .261 Acre vacant lot. Pursuant to an order dated September 24, 2013 [Docket No. 174] and as amended on November 15, 2013, this Property was authorized to be sold for $39,100, less any outstanding taxes and judgment liens, totaling approximately $10,118.74

(ii)    <u>Delancy Street, South Plainfield, New Jersey</u> (Block 255, Lot 14) - This Property is a raw undeveloped 18.27 acre vacant lot, zoned for residential use (RIO).  The current tax assessed value is $91,400.  There are outstanding taxes owed totaling approximately $10,000 - 12,000.  The Proponents believe that the assessed value is within the range of its current market value.

(iii)    <u>Liberty Ave., Union, New Jersey</u> (Block 3701, Lot 2.01) - Is a vacant parking lot consisting of 2.08 acres.  The current tax assessed value is currently $90,000 (previously $122,800 in 2011).  The Proponents believe that the assessed value is within the range of its current market value.

**B.    Principals/Affiliates of Debtor's Business**

The Debtor's current principals are:

| NAME AND ADDRESS | TITLE | CURRENT COMPENSATION |
|---|---|---|
| Iris E. Buchman | Managing Member | None[3] |

Iris Buchman also holds a 63.8828% equity interest in the debtor.

**C.    Management of the Debtor Before and During the Bankruptcy**

Iris Buchman was the Debtor's managing member prior to the Petition Date, and has continued in that role during the Bankruptcy Case.

---

[3] Ms. Buchman previously was receiving a salary, but that ceased shortly after appointment of Agent (described below) as manager for the Collateral Properties.

13

**D.     Events Leading to Chapter 11 Filing**

Debtor has been in the business of owning and operating commercial real estate properties since before the making of the loan that Lender holds.  The Debtor is a New Jersey Limited Liability Company.  The Debtor has asserted that it manages various commercial real estate throughout New Jersey consisting of the five Collateral Properties and the Non-Collateral Properties consisting of two parking lots and one undeveloped parcel of real estate.

In each of the three full calendar years preceding the year of the Debtor's bankruptcy filing, the Debtor's gross rents declined: from $2.6 million in 2008 to $2 million in 2010.

Since the Filing Date, the Debtor asserts that it primarily has focused on stabilizing its business operations, reducing overhead, reviewing and evaluating its executory contracts and unexpired personal and real property leases, and examining the various options for a plan of reorganization to ensure that maximizing value for the benefit of creditors are pursued.

Before the Filing Date, the Debtors evaluated several options to address its liquidity problems.  Despite its efforts the Debtor was unable to effectuate the necessary restructuring goals without resorting to the protections afforded by Chapter 11. Compounding these difficulties was litigation with the Debtor's former property manager and, more significantly, the Debtor's default on its substantial indebtedness originally owing to Sun National Bank ("SNB").

Lender is Debtor's largest creditor and largest secured creditor.  The Debtor is indebted to the Lender pursuant to the following documents and instruments.  On or about May 22, 2007, Debtor executed and delivered to SNB a promissory note ("Note")

14

in the original principal amount of $14,350,000.00. Repayment of the Note is secured

by, inter alia, the following:

(i)     Mortgage and Security Agreement dated May 27, 2007 from the Debtor to

SNB and recorded on June 14, 2007 in Book 6035, page 2566-2581, instrument no.

2007034833 in the office of the Somerset County Clerk, encumbering, among other

properties, 626 North Thompson Street and 575 Route 28;

(ii)     Mortgage and Security Agreement dated May 22, 2007 from the Debtor to

SNB and recorded on June 5, 2007 in the Union County Clerk's office in Mortgage Book

12182, page 344, encumbering 685 Liberty Avenue, 40 Industrial and 50 Industrial;

(iii)     Assignments of Rents from Debtor to SNB recorded in both Somerset and

Union Counties (Book 6035, page 2582-2594, Instrument No. 2007034834 on June 14,

2007 in Somerset County and Mortgage Book 12182, page 358 on June 5, 2007 in Union

County) encumbering the Collateral Properties, among others, as well as assigning the

rents to SNB;

(iv)     That certain Guarantee Agreement from Iris Buchman in favor of SNB

dated May 22, 2007 providing for guaranty of certain of the obligations owing under the

Note and Mortgage on the terms and conditions set forth in said guaranty agreement

("Guaranty"). That certain Loan and Security Agreement from the Debtors in favor of

SNB granting, inter alia, a security interest in substantially all of the Debtor's personal

property (as defined in the Loan and Security Agreement);

(v)     That certain Notification and Control Agreement among Iris Buchman,

SNB and 1St Global Capital Corp. pursuant to which Buchman granted to SNB a pledge

and security interest in the Account and Collateral (as defined in said notification and

15

control agreement) and consisting of certain liquid securities of Buchman which Lender believes currently are held by the Security Intermediary under the Notification and Control Agreement in the amount of $250,000.00; and

(vi)     An allonge to the note and assignments of the aforementioned documents and instruments, from SNB in favor of Lender pursuant to which SNB transferred all of its right, title and interest to and upon said documents to Lender, who is now the holder of the Note, the Mortgages and the other documents and instruments, (collectively, including the documents described in subparagraph (vi), the "Loan Documents").

In 2010, the Debtor's former property manager, Commercial Realty Associates ("CRA"), won an arbitration award against the Debtor.  CRA subsequently sued the Debtor in Union County New Jersey Superior Court (Case Number UNN-L-5092-10), to enforce the arbitration award.  On February 4, 2011, the New Jersey court entered judgment for $279,959.96 in favor of CRA.  According to Debtor's Statement of Financial Affairs, CRA levied certain of Debtor's bank accounts in April and May of 2011, receiving approximately $48,887.  CRA has filed a proof of claim against Debtor for $238,512.89 plus postpetition interest.

The entry of the judgment against the Debtor in favor of its former property manager constituted an event of default under the Loan Documents.  Accordingly, prior to the Debtor's filing of this bankruptcy case, the Lender sought to enforce the assignments of rents held by it by notifying the tenants at each of the Collateral Properties to pay rents directly to the Lender.  The Debtor filed for bankruptcy shortly after issuance of those notices from the Lender.

On August 17, 2011, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

**E.      Significant Events During the Bankruptcy**

**1.      Other Legal Proceedings**

The only non-bankruptcy legal proceedings currently pending against the Debtor is collection activity related to the CRA judgment (described above).  Further collection actions were stayed by the Bankruptcy case.

**2.      New Property Management**

It was the Lender's view that the Debtor did not have the resources to manage and operate the Collateral Properties properly, and Lender urged the Debtor to retain a professional management company to conduct the management and operation of the Collateral Properties.  Accordingly, the Debtor and NAI Hanson Management LLC ("Agent") entered into that certain Management Agreement (approved by the Bankruptcy Court), providing for the Agent to manage the property in accordance with the Management Agreement from December 1, 2011 through November 30, 2012.  That agreement has been extended and, as of the date of the filing of this Disclosure Statement, Agent continues to manage and operate the property.

As part of the agreement in principle by which the Proponents are proposing this Plan, Agent will continue to manage the Properties through confirmation of the Plan and subsequently shall manage the Properties as provided in the Plan until the Sales (defined below).  Lender shall be entitled to collect the rents and profits of the Properties until the closing of any Sale (or any refinance pursuant to which the Debtor pays the Qualifying Initial Sum, discussed below, in Section IIIF3, whether or not such refinance is accompanied by any termination of any lease on which Lender has been entitled to

17

collect rents) in substantially the same way that Lender has been so doing throughout this Bankruptcy Case, up to and including the then current monthly rent due from each tenant. The net proceeds of such rents and profits ("Rents") shall be applied in partial satisfaction of Lender's Allowed Claim, dollar for dollar.   However, no Rents received by Lender shall be applied against the Compromise Sum (discussed below, in Section IIIF3).

### 3.        Recovery of Preferential or Fraudulent Transfers

Debtor reports that it made transfers of $134,240.44 to creditors within the 90 days immediately preceding the commencement of the bankruptcy case.  Some or all of these payments may have been avoidable under sections 544, 547, 548 and 550 of the Bankruptcy Code.  Any cause of action to recover any transfers (an "Avoidance Action") will remain property of the estate, to be pursued or not in the discretion of the Disbursing Agent (who shall be such agent as the Lender may retain pursuant to order of the Court on appropriate notice to interested parties), other than as follows.  The Disbursing Agent shall have sole power to bring (and to elect not to bring) any Avoidance Action (other than as against Proponents; Avoidance Actions against the Proponents are being released pursuant to Section 4.1 of the Plan).  Further, to the extent that the applicable period (the "Avoidance Period") under 11 U.S.C §546 for commencing avoidance actions has expired (the date of this Disclosure Statement being more than two years after the Petition Date), the Disbursing Agent will not commence any such Avoidance Action. The Debtor analyzed Avoidance Actions prior to the expiration of the Avoidance Period and concluded that it was not in the economic interest of the Debtor's estate to initiate any Avoidance Actions.

LEGAL28595654.3

**4.      Current and Historical Financial Conditions**

The Debtor has contended that it is largely current with post-petition obligations. This is not true with respect to payment of interest accruing on Lender's Claim, where interest has accrued in excess of post-petition payments made by the Debtor to Proponent.  The Debtor's last monthly operating report filed with the Court is annexed hereto as Exhibit B.

**5.      Sale of 50 Industrial**

50 Industrial was sold pursuant to the Sale Order.  The Existing Sale Proceeds are being held by Debtor's special real estate counsel.  *See* Section IIA4 above.

**6.      Sale of 816 Garfield Avenue**

The Court approved a proposed sale of 816 Garfield Avenue pursuant to the 816 Garfield Sale Order.  The sale of this property has not closed as of the date of this Disclosure Statement.  by order dated 50 Industrial was sold pursuant to the Sale Order. The Existing Sale Proceeds are being held by Debtor's special real estate counsel.  *See* Section IIA4 above.

**7.      575 Property**

The 575 Property has been the subject of extensive repairs and environmental attention.  *See* Section IIA2 above.

**III.  SUMMARY OF THE PLAN OF REORGANIZATION**

**A.      General**

**Set forth in this section is a summary of certain of the matters contemplated to occur either pursuant to or in connection with confirmation of this Plan.  This summary highlights the substantive provisions of the Plan and is not, nor is it intended to be, a complete description or a substitute for a full and careful reading**

**of the Plan, a copy of which is annexed hereto as Exhibit A. Statements regarding projected amounts of claims or distributions (or the value of such distributions) are estimates by the Proponents based on available information and are not a representation as to the accuracy of these amounts. For an explanation of the basis for, limitations of and uncertainties relating to these calculations, see section V ("CERTAIN RISK FACTORS TO BE CONSIDERED"), below.**

**B.      Plan Overview**

A principal goal of a Chapter 11 bankruptcy case is to reorganize or liquidate a debtor's business for the benefit of itself and its creditors and interest holders. This goal is accomplished through a plan of reorganization or liquidation. The plan provides the rules and procedures pursuant to which a debtor's creditors (and interest holders, when possible), will be paid and lists the steps a debtor or its successors will take to either reorganize or wind up its business.

This Plan provides for the Debtor's assets to be marketed and transferred though a comprehensive, market-standard, prompt and efficient marketing and sales process  (the "Marketing Plan") conducted by a national or regional broker (the "Marketing Agent") to be retained by the Debtor promptly (subject to Lender's consent and agreement to the identity and terms and conditions of retention of such Marketing Agent and to the approval of the Bankruptcy Court, or (if the property cannot be sold at a price sufficient to pay the Lender's claim) an auction.  As described more fully in the Plan, all of Debtor's assets except for Avoidance Actions and certain cash on hand will be disposed of through one or more sales under the Marketing Plan (the "Sales").  Where the context requires, "Sales" include:  (1) the already-completed sale of 50 Industrial Avenue; (2)

sales conducted through the Marketing Plan; and (3) Auction Sales (defined in Section III-F3 below).  The Sales proceeds will be used to fund distributions under the Plan.

**C.      What Creditors and Interest Holders Will Receive Under the Proposed Plan**

The Plan classifies claims and interests in various classes.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each Creditor in each class will receive.

**D.      Unclassified Claims**

Certain types of claims are not placed into voting classes.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Proponents have not placed these claims in a class.

The unclassified claims described in the following sections will be paid in full from the proceeds of the sale of 50 Industrial Road, which was authorized by the Sale Order, dated March 26, 2012.

**1.      Administrative Expenses and Fees**

Administrative expenses are claims for fees, costs or expenses of administering the Debtor's Chapter 11 Case which are allowed under Bankruptcy Code section 507(a)(1), including all professional compensation requests pursuant to sections 330 and 331 of the Bankruptcy Code.  The Bankruptcy Code requires that all administrative expenses including fees payable to the Bankruptcy Court and the U.S. Trustee which were incurred during the pendency of the Chapter 11 Case must be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The Proponents reserve the right to object to any Administrative Claim on any legal basis available to it and to withdraw the Plan if total Administrative Claims exceed

21

$200,000.00. Lender recognizes that Administrative Claims as allowed are likely to exceed this amount. If there is no compromise in the aggregate by the holders of Administrative Claims, the Plan will not be confirmed.

The following chart lists all of the Debtor's unpaid administrative fees and expenses as of November 2013, an estimate of future professional fees (including those noted as accrued), and other administrative claims and fees and their treatment under the Plan.

| NAME | AMOUNT ESTIMATED | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| Teich Groh, counsel for Debtor | $100,000 | Paid as approved by the Court | Legal fees |
| Hunter Group CPA, accountants for the Debtor | $ 200,000 | Paid as approved by the Court | Accounting fees |
| U.S. Trustee | | Paid quarterly | Statutory fees |
| TOTAL | $300,000 | | |

**Court approval of professional compensation is required.** Pursuant to the Bankruptcy Code, the Court must rule on all professional compensation and expenses listed in this chart before the compensation and expenses will be owed. The professional in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Bankruptcy Court must rule on the application. Only the amount of compensation and reimbursement of expenses allowed by the Bankruptcy Court will be owed and required to be paid under this Plan as an administrative claim. As noted above, Lender intends to object to full payment of the fees accrued by the Hunter Group.

Each professional person who asserts a further administrative claim that accrues before the confirmation date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date of the Plan. Failure to file

LEGAL28595654.3

such an application timely shall result in the professional person's claim being forever barred and discharged.  Each and every other person asserting an administrative claim shall be entitled to file a motion for allowance of the asserted administrative claim within thirty (30) days of the Effective Date of the Plan, or such administrative claim shall be deemed forever barred and discharged.  No motion or application is required to fix the fees payable to the Clerk's Office or Office of the United States Trustee.  Such fees are determined by statute.

### 2.      Priority Tax Claims

Priority tax claims ("Property Tax Claims") are certain unsecured income, employment, real property, and other taxes described by Bankruptcy Code section 507(a)(8).  The Bankruptcy Code requires that each holder of such a section 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax.  On, or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date, each holder of an Allowed Priority Tax Claim shall be entitled to receive, in full settlement, satisfaction, release and discharge of and in exchange of such Allowed Priority Tax Claim, cash in an amount equal to the Allowed but unpaid portion of such Allowed Priority Tax Claim, as shall have been determined by the Lender or such other less favorable treatment as to which the Lender and such holder shall have agreed upon in writing. Pursuant to Bankruptcy Rule 3002(c)(1), all Priority Tax Claims must have been filed with the Bankruptcy Court no later than one-hundred and eighty (180) days after the Petition Date (*i.e.* February 13, 2012).

23

Debtor's schedules listed six different priority tax claims as defined in section 507(a)(8).  The Lender is informed that these tax liabilities have been paid and that Debtor is current on its property tax obligations.  In addition, the IRS has filed a claim in the amount of $843.92, asserting $743.92 as a priority.  This claim is not material to the feasibility of the Plan and will, if allowed, be paid in accordance with 11 U.S.C. 1129(a)(9)(C).

### 3.    Assumed Executory Contracts and Unexpired Leases

No later than ten days before the hearing on confirmation of the Plan, Lender shall file with the Court an Assumed Executory Contracts and Leases Notice, setting forth contracts and leases to be assumed, to the extent that there are uncured monetary defaults (by Debtor) as to any assumed contracts or leases, the amount necessary to cure the default shall be paid to the appropriate party no later than the Effective Date. Confirmation of this Plan will constitute a rejection of all executory contracts and unexpired leases that are not included in the aforementioned Notice.  Any proof of claim for damages arising out of rejection of an executory contract or lease must be filed with the Bankruptcy Court within 30 days of the order granting the rejection.

### E.    Classified Claims and Interests

### 1.    Classification of Claims and Interests

The Proponents believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim or interest into a class with other claims or interests which are "substantially similar."

### a.    Class Categories

24

—

The following classes of Claims and Interests are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which classes shall be mutually exclusive:

| CLASS | CLASS NAME | STATUS |
|-------|-----------|--------|
| Class 1 | Secured Claim of the Proponent | Impaired / Intending to Accept |
| Class 2 | Allowed Priority Claims | Unimpaired / Not Entitled to Vote |
| Class 3 | Unsecured Claims | Impaired / Entitled to Vote |
| Class 4 | Allowed Interests | Impaired / Intending to Accept |

Secured claims are claims secured by liens on property of the estate. The following narrative lists all classes of creditors containing the holders of the Debtor's secured pre-petition claims and their treatment under this Plan:

**Class 1.** <u>Secured Claim</u>. This class consists of the secured claim of Lender. Class 1 shall receive all proceeds of the Sales (including the Auction Sales, as the case may be), up to the Allowed Amount of its Claims (less any cash received as a Cash Transfer), after payment of regular closing costs and adjustments, and Professional Fees for Court-approved Professional Persons and/or Disbursing Agent).

The Allowed Class 1 Claim is impaired.

**Class 2.** <u>Allowed Priority Claims</u>. The Proponents are not aware of any Allowed Priority Claims other than one held by the IRS in the amount of $743.92. To the extent that there are Allowed Priority Claims, each holder of an Allowed Priority Claim shall be paid an amount equal to one hundred (100%) percent of the amount of such Allowed Priority Claim. Each Allowed Priority Claim shall be paid in Cash on the later of (a) ten business days after the Administrative Claim Bar Date, (b) the date such Priority Claim is Allowed, (c) the date on which payment is due in accordance with the agreement or contract giving rise to such Priority Claim, or (d) such other terms as may be mutually agreed to by the holder of such Priority Claim and Lender.

The Allowed Class 2 Claims are Unimpaired.

**Class 3.** <u>Unsecured Claims</u>. Class 3 shall consist of the Allowed Claims of those Creditors holding Unsecured Claims against the Debtor (including any Deficiency Claim of Lender). Each holder of an Allowed Claim in Class 3 shall receive: (i) Cash equal to its Pro Rata share of $100,000.00, based on a ratio of the amount of such Allowed Claim to all Allowed Class 3 Claims.

To the extent that Lender is the holder of an Allowed Deficiency Claim, and provided that Lender's Claim is Allowed as filed without any disallowance under section 506 of the Code, then Lender shall not receive any distribution on account of its Deficiency Claim.  Any funds that would be due to Lender on account of its status as a member of Class 3 shall be distributed Pro Rata to holders of Allowed General Unsecured Claims as if Lender were not part of Class 3.

Distributions to Class 3 will be made on the latter of (a) the Effective Date, or (b) the date on which such Claim becomes an Allowed Claim.

The Allowed Class 3 Claims are impaired.

**Class 4.**    <u>Allowed Interests of the Equity Holders</u>. The Equity Holders will not receive any distribution on account of such Interests unless all other Classes are paid in full.

The Class 4 Claims are impaired.

## F.    Means of Effectuating the Plan

### 1.    Funding for the Plan

The Plan will be funded by the Sales of the Debtor's assets.  Unclassified Claims (as described in Section III.D of this Disclosure Statement) will be paid with the Existing Sale Proceeds from the sale of the 50 Industrial Road property, which sale has already been approved by the Court and has closed.

Proceeds from the Sales of other assets will first be paid to Lender on account of its Class 1 Claim.  If, and only if, Lender's Class 1 claim is paid in full, remaining proceeds will be paid to holders of Class 4 interests.  The Plan is a liquidating plan and thus does not contemplate the Debtor's post-petition management.

The funds paid to holders of Class 3 claims come from the proceeds of the Sales (including the Auction Sales, as the case may be), or, if Lender is the winning bidder at the Sale, from the Existing Sale Proceeds.

### 2.      Disbursing Agent

An entity designated by Proponents not less than twenty (20) days prior to the

hearing to consider confirmation of the Plan shall act as Disbursing Agent for the purpose

of making all distributions provided for under the Plan, through the date that the last

Property Transfer occurs.    The Disbursing Agent shall be entitled to be paid

compensation at its regular hourly rate from proceeds to be distributed pursuant to this

Plan, subject to approval by the Bankruptcy Court.   The Bankruptcy Court shall retain

jurisdiction to approve such fees.   The Disbursing Agent shall be authorized to hold in

escrow the sum of $10,000 pending approval of the Disbursing Agent fees, which fees

shall be an Allowed Administrative expense.   Notwithstanding anything to the contrary,

unless the Proponents determine otherwise in the time frame set forth above, Teich Groh

(Debtor's counsel) shall be the Disbursing Agent.

### a.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to (i) take all steps and execute all

instruments and documents necessary to effectuate the disbursements to be made under

this Plan; (ii) make Distributions contemplated by this Plan; (iii) comply with this Plan

and the obligations thereunder; (iv) employ, retain, or replace professionals to represent it

with respect to its responsibilities; and (v) exercise such other powers as may be vested in

it pursuant to order of the Court or pursuant to this Plan, or as it reasonably deems to be

necessary and proper to carry out the provisions of this Plan.

### b.      Duties of the Disbursing Agent

The Disbursing Agent shall have the duties of carrying out the disbursement

under this Plan, which shall include taking or not taking any action which the Disbursing

Agent deems to be in furtherance thereof, including, from the date of its appointment,

27

making payments and conveyances and effecting other transfers necessary in furtherance of this Plan.

### 3. Conduct of the Marketing Plan and the Sale

The Proponents anticipate that, prior to confirmation of the Plan, Debtor will retain as Marketing Agent, a prominent national or regional real estate professional, to be acceptable to Lender in its discretion. As noted above, the Marketing Agent will be retained pursuant to section 327 of the Code, subject to approval by the Court. The Marketing Agent will be responsible for designing and implementing the Marketing Plan whereby the Marketing Agent will advertise and conduct a prompt, efficient, and orderly sale of the Properties. Such Sale will not be a forced liquidation sale, but instead will be designed to dispose of the Properties at a fair and reasonable price. Lender's Allowed Claim (after credit for funds delivered to Lender arising out of the rents of the Properties, in which Lender effectuated a termination of the Debtor's license to collect rents prior to the Petition Date), or such lesser amount to which Lender in its sole and absolute discretion may agree, will be paid in full at closing of the Sale.

The Properties will continue to be managed, and Lender shall be entitled to continue to collect the rents and profits of the Properties, as described in Section IIE2 above. Further, in consideration of the Lender's consent to the use of proceeds of the sale of the 50 Industrial Property to pay allowed administrative expenses and the sum to be paid to Class 3, prior to the Confirmation Date, as promptly as practicable, the Debtor shall file a motion to grant a mortgage on the Non-Collateral Properites in favor of the Lender to secure payment to the Lender of the Lender's Allowed Claim and Debtor's performance of its obligations under the Plan.

LEGAL28595654.3

If, upon the Marketing Agent's advertisement of the Properties pursuant to the Marketing Plan, the Marketing Agent is unable to procure one or more buyers offering an aggregate price sufficient to generate net proceeds equal to or greater than the Lender's Allowed Claim (or such lesser amount to which Lender may agree), an Auction Sale will be conducted, as described below, subject to the following.  If one or more affiliates of the Debtor or its principals causes to be delivered indefeasibly to Lender, on or before the latter of (a) March 31, 2014 or (b) not more than thirty (30) days after the date on which the Court enters the Confirmation Order confirming this Plan, so long as the Debtor and its principals shall have taken commercially reasonable actions to pursue confirmation of this Plan, cash equal to at least the sum of $11,750,000.00 (the "Compromise Sum"), either pursuant to a refinance or a sale of one or more of the Properties (either of which shall be considered a Sale under the Plan) (either, a "Compromise Sum Transaction"), then Lender agrees to accept the Compromise Sum as if Lender had been paid net proceeds equal to or greater than the Lender's Allowed Claim pursuant to such Sale.  As noted above in Section IIE2, no Rents collected by Lender in accordance with Section IIE2 shall be applied in credit towards the Compromise Sum.

Notwithstanding the foregoing, if one or more affiliates of the Debtor or its principals causes to be delivered indefeasibly to Lender, on or before the latter of (x) April 17, 2014 or (y) not more than thirty (30) days after the date on which the Court enters the Confirmation Order confirming this Plan, so long as the Debtor and its principals shall have taken commercially reasonable actions to pursue confirmation of this Plan (the latter of (x) or (y), the "Qualifying Initial Sum Deadline"), cash equal to at least the sum of $10,000,000.00 (the "Qualifying Initial Sum"), pursuant to a

LEGAL28595654.3

Compromise Sum Transaction, then the time for the Debtor to pay the full amount of the

Compromise Sum (against which the Qualifying Initial Sum shall be a credit) shall be

extended to the date that is thirty (30) days after the Qualifying Initial Sum Deadline,

unless Debtor on or before the Qualifying Initial Sum Deadline shall have paid to Lender,

in addition to the Qualifying Initial Sum, the sum of $50,000.00 (which shall not be

credited against the Compromise Sum but which shall become the property of the

Lender), in which case the time for the Debtor to pay the full amount of the Compromise

Sum shall be extended to the date that is forty-five (45) days after the Qualifying Initial

Sum Deadline.

If an Auction Sale is necessary, it will be conducted upon at least thirty days'

notice to holders of Allowed Claims.  Notice of the Auction Sale will also be published in

the *Star Ledger* and, at Lender's option, other publications as Lender determines is

appropriate.   Notice and publication shall occur on or after Qualifying Initial Sum

Deadline, so long as no Qualifying Initial Sum shall have been timely paid in accordance

with the preceding paragraph; if a Qualifying Initial Sum shall have been timely paid in

accordance with the preceding paragraph, but the Compromise Sum is not timely paid as

may be extended in accordance with the preceding paragraph, notice and publication

shall occur on or after the deadline for which the payment of the Compromise Sum shall

have been extended in accordance with the preceding paragraph.  The Properties not sold

pursuant to the Marketing Plan will be sold on an "as is, where is" basis to the highest

bidder, at an auction conducted pursuant to section 363 of the Bankruptcy Code.

Pursuant to section 363(k) of the Bankruptcy Code, Lender is entitled to, but is

not obligated to, credit bid at the Auction Sale.  The amount of any credit bid is referred

LEGAL28595654.3

to in the Plan as the "Total Bid," which is equal the Allowed Amount of Lender's Claim, less the amount of any Cash Transfer (as defined in the Plan and discussed further in the following paragraph).  Lender may bid in excess of the Total Bid, to the extent that Lender agrees to pay excess amounts in immediately available funds.

Following the Auction Sale, Debtor will make a Cash Transfer, in which it will transfer to Lender all of Debtor's Cash (including the Existing Sale Proceeds from the sale of 50 Industrial Road and all Sales proceeds from Sales made pursuant to the Marketing Plan), less reserves for the following: (1) the estimated amount of claims by Debtor's professionals that have not been approved by the Court, (2) estimated fees of the Disbursing Agent, (3) final costs of paying all bills for the operation and management of the Property, (4) distributions to be paid to Classes 2 and 3.

If Lender is the successful purchaser at the Auction Sale, the Properties will be transferred to Lender or Lender's Designee free and clear of liens, claims, and interests, in partial satisfaction of Lender's then-unsatisfied Allowed Claim.

If Lender is not the successful purchaser, then the proceeds of the Auction Sale (net of closing costs, Professional Fees for Court-approved Professional Persons and/or the disbursing agent), less the amount of the Cash Transfer, shall be remitted to Lender, up to the Allowed Amount of Lender's Claim.  The Properties will then be transferred to the successful purchaser, free and clear of liens, claims, and interests.  The Cash Transfer will then occur on the Effective Date.

### 4.    Income Tax Consequences of the Sale

The Proponents believe that there are no income tax consequences to the Estate from the Sales or the Auction Sale, and consequently (a) no funds from the Sale shall be escrowed for payment of income taxes on account of the sale and (b) all income tax

31

consequences of the sale to the Estate will be passed through to the holders of Interests in the Debtor, who are responsible for all income tax consequences of the sale as so passed through. Each Proponent reserves the right under section 505(b) of the Bankruptcy Code to request a prompt determination by the Bankruptcy Court of the tax consequences of the Sale or Auction Sale, as the case may be. It shall be a condition precedent to Lender's obligations under this Plan that the income tax consequences to the Estate are as set forth in this section.

### G.     Other Provisions of the Plan

#### 1.     Executory Contracts and Unexpired Leases

##### a.     Rejected if not assumed

The confirmation of this Plan shall constitute a rejection of all leases and executory contracts to which the Debtor is a party, by Lender and/or the Designee, except for those contracts and leases that shall be set forth on the Assumed Executory Contracts and Leases Notice. Any proof of Claim for damages arising out of any rejection must be filed with the Bankruptcy Court within thirty (30) days of the order granting the rejection (unless governed by a more specific order of court). Failure to file such a proof of Claim in a timely fashion shall result in its disallowance unless the Bankruptcy Court orders otherwise. If you are a party to an unexpired lease or an executory contract and you object to the above treatment of your unexpired lease or executory contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

##### b.     Objection to Assumption

Any entity which is a party to an executory contract or unexpired lease to be assumed hereunder may, at least three (3) days prior to the first scheduled date of the

Plan Confirmation hearing file with the Bankruptcy Court and serve upon each Proponent's counsel any objection to assumption setting forth the basis for the objection, the nature of any alleged defaults thereunder and all monetary and non-monetary cures allegedly due. Failure to file an objection shall be deemed a consent to the proposed assumption.

### 2.    Changes in Rates Subject to Regulatory Commission Approval

This Debtor is not subject to governmental regulatory commission approval of its rates.

### 3.    Retention of Jurisdiction

The Court will retain jurisdiction as provided in the Plan.

### 4.    Procedures for Resolving Contested Claims.

The Proponents shall have the exclusive right subsequent to confirmation of the Plan to object to the allowance of claims. If the Plan is Confirmed, each Proponent reserves the right to object to any of the scheduled claims or filed proofs of claim; provided, however, that neither Proponent will object to the claim of either Lender or Iris Buchman. Nothing in this Plan will affect or extend the Bar Date.

### 5.    Claims To Which Proponents Intend to Object

Lender previously indicated an intent to object to fees of the Debtor's accountant, Hunter Group, CPA, LLC ("Hunter"), who is employed pursuant to Section 327 of the Bankruptcy Code. In fact, Lender previously objected (and subsequently withdrew its objection) to one of Hunter's fee applications. Lender does not intend to object to any pending Hunter fee applications but, as noted above, Lender is not prepared to pay more than $200,000 to holders of Administrative Claims in the aggregate. If there is no

compromise in the aggregate by the holders of Administrative Claims, the Plan will not be confirmed.

### 6.    Release of Debtor Claims against Lender and Lender Against Iris Buchman

Except as expressly provided in the Plan, the rights afforded to Holders of Claims by and in the Plan, shall be in exchange for, and in complete release, satisfaction and discharge of, all claims of the Debtor and Lender against each other and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature of the Debtor and Lender against each other, and of Debtor against any of Lender's present and former agents, attorneys, representatives, trustees, bankers and other lenders, financial advisors, investment bankers, appraisers, affiliates, successors and assigns, arising from or concerning or relating to any claims of the Debtor or Lender against each other, except for claims arising from fraud, willful misconduct or gross negligence and as provided in the Plan.

Upon the earlier of (a) payment of the Compromise Sum and/or (b) conduct of the Auction Sale, each of Lender and Iris Buchman shall release, satisfy and discharge all claims of each other against each other arising out of or relating to the Lender's Allowed claim, acceptance of distributions under and benefits of the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature of Iris Buchman and Lender against each other (including the personal guaranty from Iris Buchman in favor of Lender and release by Lender of its security interest in that certain securities account previously granted by Iris Buchman originally in favor of Lender's predecessor in interest and now held by Lender), and of Iris Buchman against any of Lender's present and former agents, attorneys, representatives, trustees, bankers and other lenders, financial

LEGAL28595654.3

advisors, investment bankers, appraisers, affiliates, successors and assigns, arising from or concerning or relating to the Lender's Allowed Claim, except for claims arising from fraud, willful misconduct or gross negligence and as provided in the Plan.

**H.     Conditions Precedent to Effective Date**

Subject to waiver by the Proponent, the occurrence of the Effective Date of this Plan is subject to the following conditions precedent:

**a.**     The Confirmation Order shall have become a Final Order;

**b.**     Any and all other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of this Plan shall have been executed, and approved by the Court, if necessary, prior to the Effective Date;

**c.**     The Administrative Claims do not exceed $200,000.00; and

**d.**     The income tax consequences of the Plan to the Estate are as set forth in section III.F.4 above.

If the above conditions of the Plan are not met, the Proponents may (i) withdraw the Plan, or (ii) waive, in whole or in part, any such conditions.

**2.     Modification**

The Lender may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in section 1127(b) of the Bankruptcy Code.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

**A.     Who May Vote or Object**

**1.     Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.     Who May Vote to Accept/Reject the Plan**

35

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### a.      What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party-in-interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS NOVEMBER 13, 2011.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's Schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

In addition to objections with respect to late filed Claims, any Claim filed after any applicable Bar Date shall, unless the Court otherwise directs, be deemed disallowed in full and expunged without further order of the Court.  Filed or claims appearing on the Debtor's Schedules may be amended or reconsidered only as provided in the Bankruptcy Code and Bankruptcy Rules.

### b.    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of their claim plus interest.

In this case, the Proponents believe that all classes other than Class 2 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  Parties who dispute the Proponents' characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponents have incorrectly characterized the class.

### 3.    Who Is <u>Not</u> Entitled to Vote

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority treatment pursuant to Code section 507(a)(1), (a)(2), and (a)(7); and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

LEGAL28595654.3

4.        **Who Can Vote in More Than One Class**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

5.        **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in this Disclosure Statement.

6.        **Votes Necessary for a Class to Accept the Plan**

A class of claims is considered to have accepted the Plan when (a) more than one-half (½) in number and (2) at least two-thirds in dollar amount of the allowed claims that actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (b) in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

7.        **Treatment of Non-accepting Classes**

As noted above, even if an impaired class does not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown".  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of section 1129(a)(8) and if the Plan does not "discriminate unfairly"

and is "fair and equitable" toward each impaired class that has not voted to accept the

Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

### 8. Request for Confirmation Despite Non-acceptance by Impaired Classes

The Proponents ask the Bankruptcy Court to confirm this Plan by cramdown on

impaired classes if any of these classes do not vote to accept the Plan.

### B. Best Interests of Holders of Claims and Interests/Liquidation Analysis

The "best interests of creditors" test requires that the Bankruptcy Court find either

that all members of each impaired class have accepted the plan or that each holder of an

allowed claim or interest of each impaired class of claims or interests will receive or

retain under the plan on account of such claim or interest property of a value, as of the

effective date of the plan, that is not less than the amount that such holder would so

receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on

such date.

To calculate what holders of Allowed Claims would receive if the Debtor were

hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Court must first

determine the dollar amount that would be realized from the liquidation of the Debtor.

The funds obtained from liquidation would consist of the net proceeds from the

disposition of the Debtor's assets (after satisfaction of all valid liens) augmented by the

cash held by the Debtor and recoveries on actions against third parties, if any. The fund

would then be reduced by the costs of the liquidation. The costs of liquidation under

chapter 7 would include the fees and expenses of a trustee, as well as those of counsel

and other professionals that might be retained by the trustee, selling expenses, any unpaid

expenses incurred by the Debtor during the Chapter 11 Case (such as fees for attorneys,

financial advisors and accountants) which would be allowed in the chapter 7 proceedings, interest expense on secured debt and claims incurred by the Debtor during the pendency of the case.

The Proponents believe that a chapter 7 liquidation of the Debtor's assets would result in less value being realized under the Plan by holders of Allowed Claims than what is proposed under the Plan. That belief is based upon the following liquidation analysis:

| Property | Valuation |
|---|---|
| 626 North Thompson, Raritan | $    765,000.00 |
| 575 Route 28, Raritan | 3,000,000.00 |
| 685 Liberty, Union | 3,800,000.00 |
| 40 Industrial, Berkeley Heights | 2,300,000.00 |
| 50 Industrial, Berkeley Heights (proceeds of sale already conducted) | 2,553,089.18 |
| Non-Collateral Properties | 200,000.00 |
| Grand Total: | $12,868,089.18 |
| Lender Claim as of 10-24-13 | $16,095,668.72 |

As a result, the Proponents believe that no creditor other than the Lender would receive any distribution of any kind in a chapter 7 liquidation.  Since the Plan provides for a positive distribution for each Allowed Claim, the Plan satisfies the best interests tests.

**C.      Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on such date.  The Proponents maintain that this aspect of feasibility is satisfied as illustrated here:

| | |
|---|---|
| Cash Debtor will have on hand by Effective Date | $ 2,734,000[4] |
| **To Pay:**  Administrative claims (including professional fees) | 200,000 |
| **To Pay:**  Statutory costs & charges | 10,000 |
| **To Pay:**  Payments to Class 3 | 100,000 |
| **To Pay:**  Cash Transfer | 2,424,000 |
| Balance after paying these amounts.................................................. | 0 |

The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

| | |
|---|---|
| $  2,724,000 | $ Est. Cash in DIP Account as of November 30, 2013 |
| 10,000 | Additional cash DIP will accumulate from net earnings between now and Effective Date |
| +        0 | Capital Contributions (none required under Plan) |
| $  2,734,000 | Total |

The second aspect considers whether there will be enough cash over the life of the Plan to make the required Plan payments.  Since all payments are due on the Effective Date, the cash shown above suffices to show that all Plan payments can be made.

Accordingly, the Proponents believe, on the basis of the foregoing, that the Plan is feasible.

---

[4] Assuming no further Sales are made prior to the Effective Date.

**V.**

**CERTAIN RISK FACTORS TO BE CONSIDERED**

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.      Certain Bankruptcy Law Considerations**

**1.      Risk of Non-Confirmation of the Plan**

Although the Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

**2.      Risk of Non-Occurrence of the Effective Date**

Although the Proponents believe that all of the conditions to the Effective Date will occur after the entry of the Confirmation Order, there can be no assurance as to the timing of the Effective Date or that such conditions will ever occur.

**B.      Additional Factors to be Considered**

**1.      The Proponents Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**2.      No Representations Outside This Disclosure Settlement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

**3.      Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurance or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

43

4.      **No Legal or Tax Advice is Provided to You By This Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each creditor or equity interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its claim or equity interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.  However, nothing in this subsection shall derogate from section III.F.4 of this Disclosure Statement regarding income tax consequences of the Sale.

5.      **No Admission Made**

Without derogating from section III.F.4 of this Disclosure Statement, nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of claims or equity interests.

6.      **Objection to Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Proponents believe that the classification of claims and interests under this Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no guaranty that the Court would reach the same conclusion.

LEGAL28595654.3

# VI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**A.      Taxes**

The following discussion summarizes some of the more significant United States federal income tax consequences of the Plan to certain holders of Claims or Equity Interests. The analysis contained herein is based upon the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local income tax, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, broker-dealers and tax-exempt organizations). Accordingly, it should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Equity Interest.

Due to the complexity of certain aspects of the Plan, some of which are discussed below, the lack of applicable legal precedent and the possibility of changes in law, the differences in the nature of various Claims, the differences in individual Claim or Equity

45

Interest holders' methods of accounting, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE PROPONENTS WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE UPHELD. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

NOTHING IN THIS SUBSECTION SHALL DEROGATE FROM ARTICLE III, SECTION F4 OF THIS DISCLOSURE STATEMENT.

46

### 1.      Allocation of Consideration to Interest

A portion of the consideration received by a holder in satisfaction of an Allowed Claim pursuant to the Plan may be allocated to the portion of such Allowed Claim (if any) that represents accrued but unpaid interest. Unless otherwise proscribed under applicable statute or rule, distributions under the Plan are allocated first to the principal of a Claim, then to any accrued interest. If any portion of the distributions were required to be allocated to accrued interest, such portion would be taxable to the holder as interest income, except to the extent the holder has previously reported such interest as income.

In that event, only the balance of the distributions would be considered received by the holder in respect of the principal amount of the Allowed Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the holder with respect to the Allowed Claim. If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the distributions is treated as interest, holders may be required to provide certain tax information in order to avoid the withholding of taxes. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL INCOME TAX TREATMENT OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS.

TAX CONSEQUENCES MAY VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR

REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX

CONSEQUENCES UNDER THE PLAN.

**B.      New Common Stock**

Since no new equity interests are being issued under the Plan, the Plan does not

present tax issues relating to conversion of debt to equity.

## VII.

## EFFECT OF CONFIRMATION OF PLAN

**A.      Effect of Confirmation or non-Confirmation on Plan.**

If Confirmation of the Plan does <u>not</u> occur or if, after Confirmation occurs, the

Proponents elect to terminate the Plan, the Plan shall be deemed null and void.  In such

event, nothing contained in the Plan shall be deemed to constitute a waiver or release of

any claims against the Proponents or any other persons, or to prejudice in any manner the

rights of the Debtor's estate or any person in any further proceeding involving the Debtor

or its estate. The provisions of the Plan shall be binding upon the Debtor, all Creditors

and all Equity Interest Holders, regardless of whether such Claims or Equity Interest

Holders are impaired or whether such parties accept the Plan, upon Confirmation thereof.

**B.      Exculpation**

Except as expressly provided in the Plan, the rights afforded to Holders of Claims

by and in the Plan, shall be in exchange for, and in complete release, satisfaction and

discharge of, all claims against the Lender, and acceptance of such distributions under the

Plan shall be deemed irrevocably to release any and all claims of any type, kind, or nature

against the Lender and any of its respective present and former agents, attorneys,

representatives, trustees, bankers and other lenders, financial advisors, investment

bankers, appraisers, affiliates, successors and assigns, arising from or concerning or

48

relating to any claims against the Lender, except for claims arising from fraud, willful misconduct, or gross negligence and as provided in the Plan.

**C.      Non-Vesting of Property in the Debtor**

Since the Plan is a liquidating plan, none of the Assets will be vested in the Debtor once a Property Transfer occurs.

**D.      Modification of Plan**

The Lender may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan if Lender modifies the plan before confirmation.

The Lender may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after notice and a hearing.  Lender further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

**E.      Post-Confirmation Conversion/Dismissal**

A Creditor or party in interest may bring a motion to convert or dismiss the case under section 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under section 1112(b). If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed or transferred pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested

LEGAL28595654.3

property only to the extent that relief from stay was not previously granted by the Court during this case.

### F.     Post Confirmation Fees

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the U.S. Trustee post-confirmation until such time as the Chapter 11 Case is converted, dismissed, or closed pursuant to a final decree.

## VIII.

## ALTERNATIVES TO REORGANIZATION PLAN

If the Plan is not confirmed, Debtor agrees that it will consent to a motion by Lender seeking relief from the automatic stay, thus allowing Lender to exercise non-bankruptcy remedies against the Collateral Properties, including foreclosure. Debtor and Lender would also be at liberty to enter into transactions to achieve the same, or better, results as anticipated by this Plan through non-bankruptcy procedures.

Alternatively, the Chapter 11 Case could be converted to a case under Chapter 7 of the Bankruptcy Code. In that event, a trustee would be appointed to liquidate and distribute the remaining assets of the estate. The Proponents believe that a liquidation under Chapter 7 would likely result in a lower return to holders of claims, due in part to the nature of the debtor's asserts, and the time which would elapse until proceeds are received.

## IX.
## CONCLUSION

The Proponents urge holders of Claims and Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their ballots so they will be received not later than _____ , 2014 at 5:00 p.m.

50

Date:  November 27, 2013

**SPF 2011 OWNER LLC**                    **FISHBEIN FAMILY, LLC**


**BY:** /s/_____      **BY:** /s/_____
      **Dennis Davis**                            **Iris Buchman**
      **Authorized Signatory**                    **Managing Member**

**PERKINS COIE LLP**                      **TEICH GROH**


**BY:** /s/_____      **BY:** /s/_____
      **Gary F. Eisenberg, Esq.**                 **Brian W. Hofmeister**
      **Attorney for Lender**                     **Attorney for Debtor**

51